The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Sheila Marie SMITH,
Defendant-Appellee.

No. 85SA225.

Supreme Court of Colorado,
En Banc.

April 21, 1986.

**1116**

18–3–102(1)(a), 8 C.R.S. (1978), and a crime of violence, section 16–11–309, 8 C.R.S. (1985 Supp.). The information alleged that the defendant murdered Kermit Neil (Joey) Reasoner with a knife on or before September 23, 1984 at a bar in Arvada, Colorado. This interlocutory appeal by the prosecution followed the entry of an order suppressing two statements made by the defendant after her arrest. We reverse and remand for further proceedings consistent with this opinion.

I.

The issue on appeal is whether the statements made by the defendant in this case were voluntary based upon an examination of the record and the totality of the circumstances. *People v. Raffaelli,* 647 P.2d 230 (Colo.1982). There is no question that the defendant was properly advised of her rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The sole question relates to the voluntariness of the two statements that the defendant made while she was in custody. We are bound by the trial court's factual findings if those findings are supported by adequate evidence in the record. *People v. Freeman,* 668 P.2d 1371 (Colo. 1983). In this case, contrary to the trial court's findings, the evidence is sufficient to support a finding that the two statements in issue were voluntarily made by the defendant.

Shortly before midnight on September 22, 1984, the Arvada police were dispatched to the Arvada Tavern Bar in response to a report of a stabbing. It is undisputed that the defendant and Joey Reasoner (victim) had argued earlier in the evening, and that the defendant had been threatened by the victim with a broken beer bottle. The defendant, in response, took a knife from her purse and held it in her hand while she was at the bar. Soon thereafter the defendant left the bar, followed by the victim. Eyewitness testimony established that the defendant stabbed the victim as he exited the bar, and that he fell back through the door into the bar bleeding profusely. He subse-

Nolan L. Brown, Dist. Atty., Dennis W. Brown, Catherine S. Roberts, Deputy Dist. Atty., Golden, for plaintiff-appellant.

Gene A. Ciancio, P.C., Gene A. Ciancio, Thornton, for defendant-appellee.

ERICKSON, Justice.

The defendant, Sheila Marie Smith, was charged with first-degree murder, section

quently died due to massive loss of blood resulting from two stab wounds in the heart.

The first police officer to arrive at the bar observed the defendant leaving the scene in her car. When a bar patron advised the officer that the defendant was the assailant, the officer gave chase and stopped the defendant a short distance from the bar. The knife used by the defendant in the attack was found on the floor of her car. The officer placed the defendant under arrest and advised her of her *Miranda* rights. She was then taken to the Arvada Police Department. At the police station, the officer removed her handcuffs and placed her in a holding cell. While in the cell, the defendant expressed both sorrow and anger but made no statement to the arresting officer. Detective James Vanderohe talked to the defendant shortly after 1:00 a.m. During this conversation, the defendant stated: "I just had to do it. He's been bothering me so much. I'm going to jail, ain't I." The detective replied that she was in jail and that he would talk to her after she was photographed and booked.

Approximately twenty minutes later, the defendant was taken to an interview room where she asked about the condition of the victim. Detective Vanderohe responded that he had received word that the victim had "expired at the hospital." The detective testified that the defendant became upset and said: "Oh, Joey, I didn't want to hurt him. He just kept—he pulled the knife on me and I took it away and I stabbed him. I didn't mean to hurt him. I just [blank] him to stay away from me." At that point the detective attempted to advise the defendant of her *Miranda* rights and to obtain a written waiver, but the defendant became defiant. The interview ended when the defendant said that she was not going to sign anything.

The defendant was then taken downstairs to obtain additional information relating to her booking and was again defiant and uncooperative. She asked to make a telephone call to her husband, and Detec-

tive Vanderohe took the defendant to the patrol sergeant's room. He then dialed the number that she had given him and handed her the telephone. The detective remained in the room during the defendant's conversation with her husband, which occurred at approximately 2:55 a.m. The detective heard the defendant say: "I killed somebody, killed Joey, stabbed him. He pulled a knife and I fought back. He tried to hit me again. He pulled a knife and I took it away from him and stuck it into him." Detective Vanderohe testified that he remained in the room with the defendant while she was talking to her husband because she was a suspect in custody and because of security concerns relating to possible weapons in the room.

## II.

The trial court found that the statement made by the defendant in the interview room was precipitated by the defendant's inquiry about the victim, and that the defendant was emotionally upset at the time she made the statement. According to the trial judge, the effect on "the normal person" of learning that the victim had died would be so traumatic as to overbear the person's will. The defendant's emotional trauma, coupled with her earlier and later refusal to make a formal statement, led the trial court to conclude that the statement was involuntary. The court ruled that the statement would not be admissible in the prosecution's case-in-chief but reserved judgment on the use of the statement for rebuttal purposes.

Regarding the telephone statement, the trial court found that Detective Vanderohe, after handing the defendant the telephone, remained in the room taking notes at a distance no further than six feet from the defendant. The court found that the defendant spoke in a normal voice during the telephone conversation, and that she would have known that Detective Vanderohe could hear her had she turned around so that she could see him. However, the court noted that the defendant had twice indicated her desire not to make a formal

statement, and that there was no sign in the room stating that telephone conversations were monitored. Concluding that the defendant would not have made the incriminating statement if she had been aware of Detective Vanderohe's presence, the trial court held that the statement was involuntary. In so ruling, the court apparently believed that the defendant had a reasonable expectation of privacy in her telephone conversation. Therefore, the trial court suppressed the telephone statement for use in the prosecution's case-in-chief but again reserved ruling on the use of the statement for rebuttal purposes.

### III.

A voluntary statement by a defendant is admissible in the prosecution's case-in-chief. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *People v. Fordyce,* 200 Colo. 153, 612 P.2d 1131 (1980). We have declared that "voluntary" means that the statement was not extracted by threats or violence, promises, or undue influence. *People v. Freeman,* 668 P.2d 1371 (Colo.1983). We have also said that the mental condition of the defendant at the time the statement was made is one factor to be considered in determining whether the statement was voluntary. *People v. Raffaelli,* 647 P.2d 230 (Colo. 1982).

■ Here, there is no evidence of any police misconduct prior to the defendant's incriminating statement in the interview room. When the defendant asked Detective Vanderohe about the victim's condition, he honestly responded that the victim had died. Simply because the defendant became upset when she learned that the victim had died was not a sufficient basis for the trial court's conclusion that her statement was involuntary. In *Raffaelli,* 647 P.2d at 230, there was evidence of lengthy, accusatorial interrogation by the police immediately preceding the confession as well as psychiatric testimony concerning the defendant's emotional distress at the time of the confession. In view of the facts in *Raffaelli,* we upheld the trial

court's ruling that the confession was involuntary. By contrast, in this case we have only the detective's testimony that the defendant was upset and a tape recording of the brief interview reflecting that the defendant was crying at the time she made the statement. This evidence is simply insufficient to support a finding that the defendant's incriminating statement was involuntary.

■ The absence of evidence to support the suppression of the defendant's telephone call is also apparent. A prisoner who is accompanied to a telephone by jailhouse personnel does not have a reasonable expectation of privacy in his telephone communications. *People v. Gallegos,* 179 Colo. 211, 499 P.2d 315 (1972); *State v. McKercher,* 332 N.W.2d 286 (S.D.1983); *see also People v. Blehm,* 44 Colo.App. 472, 623 P.2d 411 (1980); *People v. Harfmann,* 38 Colo.App. 19, 555 P.2d 187 (1976). Here, Detective Vanderohe led the defendant to a telephone, dialed the number, and handed her the receiver. For security reasons, the detective remained in the room with the defendant, standing only a few feet from her. The defendant spoke in a normal tone of voice and knew, or should have known, that the detective could overhear the conversation with her husband. The facts here are strikingly similar to those in *Gallegos,* 179 Colo. at 211, 499 P.2d at 315, and *McKercher,* 332 N.W.2d at 286. We hold, as we did in *Gallegos,* and as the Supreme Court of South Dakota did in *McKercher,* that the defendant did not have a reasonable expectation of privacy in the telephone conversation with her husband.

■ The trial court's only basis for finding the defendant's telephone statement involuntary was that she would not have made the statement had she known that Detective Vanderohe could hear her. Since we have held that the defendant did not have a reasonable expectation of privacy in her telephone conversation, the trial court's ruling must be reversed.

In this case, the trial court blurred two separate and distinct legal concepts. The issue before the court at the suppression hearing was whether the defendant's telephone statement was voluntary. The voluntariness of the defendant's statement depends upon the totality of the circumstances, including the conduct of the police and the defendant's mental condition at the time she made the statement. The voluntariness requirement is derived from the fifth amendment privilege against self-incrimination and the due process clause of the fourteenth amendment. *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); W. LaFave & J. Israel, *Criminal Procedure* 264–65 (1985). The trial court's conclusion that the defendant's telephone statement was involuntary was premised upon the fourth amendment concept that the defendant had a reasonable expectation of privacy in her telephone conversation. In our view, the defendant's privacy interests did not affect the voluntariness of her statement, and the two concepts should not be confused.

The order of the trial court suppressing the defendant's statements is reversed, and the case is remanded for further proceedings consistent with this opinion.

QUINN, C.J., specially concurs.

QUINN, Chief Justice, specially concurring:

I specially concur in the court's reversal of the order suppressing the defendant's statement to Detective Vanderohe and her subsequent telephone conversation with her husband.

I.

The ultimate test of the voluntariness of the defendant's statement to Detective Vanderohe in the interview room of the stationhouse is whether the statement was a product of a rational intellect and a free will. *E.g., Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *People v. Raffaelli,* 647 P.2d 230 (Colo.1982). Resolution of this issue turns on an evaluation of the totality of circumstances surrounding this statement, including such factors as the presence or absence of force, threats, promises, and other forms of undue influence that might have affected the free will of the accused, as well as the defendant's mental condition at the time the statement was made. *E.g., Culombe,* 367 U.S. 568, 81 S.Ct. 1860; *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242, (1960); *People v. Connelly,* 702 P.2d 722 (Colo.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 785, 88 L.Ed.2d 763 (1986).[1]

In this case there is no evidence to support the conclusion that the defendant's statement to Detective Vanderohe was the product of any force, threats, promises, or other forms of undue influence exerted against the defendant by law enforcement officers. Nor does the record contain any evidence demonstrating that the defendant's statement was the product of a serious mental illness such as to vitiate the defendant's capacity for rational judgment and free choice. Although there is some evidence indicating that the defendant became emotionally distressed after being informed of the victim's death, such distress was not sufficient to so impair her intellect and will as to render her statement involuntary. Given the state of the record in this case, I agree with the court that the defendant's statement should not have been suppressed.

---

**1.** In *Blackburn v. Alabama,* 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960), the United States Supreme Court stated:

Surely in the present state of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion.

## II.

I also agree that there is no basis in the record for the suppression of the defendant's telephone conversation with her husband, which was made from the police station and overheard by Detective Vanderohe. The trial court concluded that the defendant had a reasonable expectation of privacy in the telephone call and, on that basis, suppressed the defendant's statement to her husband as involuntary. The defendant's expectation of privacy with respect to her telephone call, however, should not have been viewed as a material factor in determining the voluntariness of her statement. As previously noted, the issue of voluntariness turns basically on whether a particular statement was the product of a rational intellect and a free will. Whatever the defendant's privacy expectation may have been at the time of her telephone call to her husband, that expectation had no bearing whatever on the voluntary nature of her statement to her husband. The record at the suppression hearing convincingly establishes that the defendant's telephone conversation with her husband was the product of a rational intellect and a free will.

The issue to which the defendant's expectation of privacy in the telephone conversation bears legal significance is whether Detective Vanderohe's overhearing of the conversation constituted an unlawful search and seizure. *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *People v. Santistevan,* 715 P.2d 792 (Colo.1986); *People v. Unruh,* 713 P.2d 370 (Colo.1986). I am convinced that there was no unlawful search or seizure in this case. The defendant's telephone conversation with her husband took place from the Arvada police station where the defendant was confined in lawful custody on a charge of murder. Any expectation of privacy on the part of the defendant under these circumstances was a substantially diminished one. *See Lanza v. New York,* 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962). In the absence of some explicit or implicit assurance that the defendant's statements to her husband would remain confidential, she had no reason to expect that Detective Vanderohe or anyone else in the room would not listen to her conversation. Not only was there no assurance of confidentiality given to the defendant, but the trial court also expressly found that, although the defendant did not know the exact location of Detective Vanderohe when she talked to her husband, "[s]he knew that he was standing next to her at the desk." Under this state of the record, there was neither a factual nor a legal basis for the suppression of the defendant's telephone conversation with her husband.

For the above reasons, I specially concur in the reversal of the suppression rulings in this case.